*Attorney Grievance Commission of Maryland v. Jeneba Jalloh (Ghatt)*, Misc. Docket AG No. 2, September Term, 2017.  Opinion by Getty, J.

## ATTORNEY DISCIPLINE – SANCTIONS – DISBARMENT

The Court of Appeals disbarred an attorney who engaged in intentionally dishonest conduct and misused trust money.  Specifically, the attorney entered into two escrow agreements with clients, which effectively allowed the clients to misuse the attorney's trust account as part of an advanced fee scam.  Although the attorney may not have been originally involved in the fraudulent scheme, the attorney did not verify the security of the funds as required and disbursed trust money in ways not authorized by any agreement or by the owner.  The attorney subsequently misrepresented the existence of the escrow agreements creating the scam, her involvement in the scam, and her disbursements of the money.  These actions violated the Maryland Lawyers' Rules of Professional Conduct 1.15 (Safekeeping Property), 3.3 (Candor toward the Tribunal), 8.1 (Bar Admission and Disciplinary Matters); 8.4 (Misconduct), former Maryland Rule 16-607 (Commingling of Funds), former Maryland Rule 16-609 (Prohibited Transactions), and Business Occupations and Professions Article of the Maryland Code § 10-306 (Misuse of Trust Money) and § 10-606 (Penalties).

Circuit Court for Prince George's County
Case No. CAE17-07833
Argued: April 10, 2018

IN THE COURT OF APPEALS
OF MARYLAND

Misc. Docket AG No. 2

September Term, 2017

_____

ATTORNEY GRIEVANCE COMMISSION
OF MARYLAND

v.

JENEBA JALLOH (GHATT)

_____

Barbera, C.J.
Greene,
Adkins,
McDonald,
Watts,
Hotten,
Getty,

JJ.

_____

Opinion by Getty, J.

_____

Filed: August 29, 2018

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Bessie Decker, Clerk
April 20, 2018

This attorney disciplinary matter concerns a Maryland-barred attorney who acted as a facilitator in a complex money laundering scheme that induced investors to advance funds in exchange for a false promise of a full return of the advanced fees and a future construction loan under the guise of an escrow agreement. Specifically, Respondent Jeneba Jalloh Ghatt[1] ("Respondent" or "Ms. Ghatt") agreed that her law firm would serve as escrow agent, which in effect converted her attorney trust account into a repository for the advanced fee scam. Although Respondent may not have initially been a knowing participant involved in the complex fraudulent scheme, she ultimately became complicit in the scam when she failed to verify and safeguard the advanced funds and then misrepresented her disbursements of those funds. For these reasons, we disbar Ms. Ghatt.

On March 9, 2017, the Attorney Grievance Commission of Maryland ("Commission"), through Bar Counsel, filed with this Court a Petition for Disciplinary or Remedial Action ("Petition") against Ms. Ghatt. The Commission charged Respondent with violating Rules 1.15 (safekeeping property), 3.3 (candor to the tribunal), 8.1 (bar admission and disciplinary matters), and 8.4(a)-(d) (misconduct) of the Maryland Lawyers' Rules of Professional Conduct ("MLRPC").[2] The Petition also alleged the Respondent

---

[1] Although the entire record reflects that the Respondent's name is Jeneba Jalloh Ghatt, the Respondent is barred in Maryland as Jeneba Jalloh. No document or pleading in the record provides a reason for the discrepancy between her name as appears in this matter and her name as appears in the Maryland Attorney listing. This discrepancy explains the title in this matter, *Attorney Grievance Commission of Maryland v. Jeneba Jalloh (Ghatt)*, which uses a parenthetical around the Respondent's purported last name. To avoid confusion, this opinion will refer to the Respondent as Ms. Ghatt or simply Respondent.

[2] Effective July 1, 2016, the MLRPC were renamed the Maryland Attorneys' Rules of Professional Conduct ("MARPC"), which were moved to Title 19, Chapter 200 of the

violated former Maryland Rules 16-607 (commingling of funds) and 16-609 (prohibited transactions),[3] as well as Sections 10-306 (misuses of trust money) and 10-606 (penalties) of the Business Occupations and Professions Article of the Maryland Code. After the complaint was filed, Ms. Ghatt obtained the law firm Cunningham & Associates, PLC to represent her in the attorney grievance matter.

Pursuant to Maryland Rule 19-722, this Court designated the Honorable Krystal Alves of the Circuit Court for Prince George's County to conduct an evidentiary hearing ("the attorney grievance hearing" or "hearing") and to provide findings of fact and recommended conclusions of law. After being served with a copy of the Petition, Ms. Ghatt filed a Motion to Dismiss on June 6, 2017. After the circuit court denied the motion to dismiss, Respondent filed an Answer to the Petition on July 6, 2017. After the conclusion of discovery, Ms. Ghatt filed a Motion for Partial Summary Judgment, which the circuit court denied by order dated October 23, 2017. The attorney grievance hearing was held on October 23, 24, 25 and 26, 2017. Although she had previously obtained counsel, Ms. Ghatt represented herself throughout the attorney grievance hearing.

The attorney grievance hearing judge issued findings of fact and recommended conclusions of law on January 23, 2018. Specifically, the hearing judge concluded that the Respondent violated MLRPC 1.15(a), (b), (d), and (e); 3.3(a)(1); 8.1; and 8.4(a), (b), (c),

---

Maryland Rules. This opinion refers to the MLRPC rather than the MARPC because all relevant conduct took place before July 1, 2016.

[3] Effective July 1, 2016, these two rules were re-codified as Maryland Rules 19-408 and 19-410 respectively.

and (d). In addition, the hearing judge further concluded that Ms. Ghatt violated former Maryland Rules 16-607 and 16-609 as well as Sections 10-306 and 10-606 of the Business Occupations and Professions Article ("BOP") of the Maryland Code.

Respondent filed exceptions to the hearing judge's findings of fact and recommended conclusions of law. Ms. Ghatt takes four extensive exceptions to the hearing judge's factual findings, arguing that the circuit court adopted the proposed findings of facts and conclusions of law submitted by the Commission in its entirety. In addition, Respondent excepts to the hearing judge's recommended conclusions of law regarding MLRPC 1.15, 3.3, 8.1, and 8.4 as well as Sections 10-306 and 10-606 of the Business Occupations and Professions Article. Ms. Ghatt does not take exception to the hearing judge's recommended conclusion that she violated former Maryland Rules 16-607 and 16-609. Ultimately, Ms. Ghatt requests that this Court impose a reprimand as the appropriate sanction in this case because she alleges the only violation was commingling of funds. On April 10, 2018, this Court heard oral arguments in this matter. Ms. Ghatt appeared and argued on her own behalf.

## BACKGROUND

We summarize the hearing judge's findings of fact and the record submitted at the attorney grievance hearing as follows.

### *Ms. Ghatt's Law Practice*

Ms. Ghatt was admitted to the Maryland Bar on December 16, 1998. After being admitted to the Bar of this Court, Ms. Ghatt worked as a staff attorney at Georgetown University Law Center, a lawyer at Willkie Farr & Gallagher, LLP, then served as assistant

3

general counsel to the District of Columbia Office of Cable, Television, and Telecommunications. In 2007, Ms. Ghatt opened her own law firm, the Ghatt Law Group, LLC, in Prince George's County, Maryland. At the time she formed her solo law practice, Ms. Ghatt also formed what she called Strategic Partnership, which was an informal referral system between herself and two other out-of-state attorneys. During the period pertinent to this case, Ms. Ghatt worked as a solo practitioner at the Ghatt Law Group. Ms. Ghatt supplemented her solo practice with work as a blogger, columnist, and speaker.

In June 2007, Ms. Ghatt opened an attorney trust account at Citibank in the name of the Ghatt Law Group, LLC. The Ghatt Law Group attorney trust account has an account number ending in 8589. Ms. Ghatt signed a CitiEscrow Control Account Application, which provided that the Control Account Title was the Ghatt Law Group, LLC Attorney Trust. Ms. Ghatt also signed a General Deposit Resolution for Limited Liability Company, in which Ms. Ghatt listed herself as the sole signatory with authority to control and access the attorney trust account.

### Escrow Agent Agreement with the Chore Group, LLC

Ms. Ghatt entered into an "Escrow Agreement" with Strategic Capital Enterprises (a Delaware limited liability company) and Zion Capital, Inc. (a Maryland corporation) that provided for funds to be deposited in escrow to the attorney trust account of the Ghatt Law Group, serving as the "Escrow Agent." The Escrow Agreement was signed by Zion Capital Ventures and Strategic Capital, LLC as a collective joint venture entitled "The Chore Group, LLC." The name Solomon Jalloh ("Mr. Jalloh), who Ms. Ghatt acknowledged is her brother, appears underneath the collective joint venture signature line

4

as program manager and JV partner and principal. The Chore Group dated the Escrow Agreement on September 1, 2014. Although a signature line for the Ghatt Law Group, LLC, identifying Jeneba Jalloh Ghatt as managing partner, also appears on the Escrow Agreement, the signature and date line of the copy in the record appear blank.

The Escrow Agreement further provided that "the Escrow Agent is authorized to use the following funds transfer instructions to disburse funds without a verifying call-back []. If distribution is in accordance with this Section [], by providing written instructions to the Escrow Agent in the form of Exhibit A, no call-back [] is required." Exhibit A to the Escrow Agreement was a Disbursement Request form, which states that a certain specified amount will be disbursed from the Ghatt Law Group's attorney trust account to an account identified by either Strategic Capital or Zion Capital. The Escrow Agreement also indicated that the "parties hereto agree that escrow fees shall be due and payable in the amount of $1,000.00 each month, and .05% of any disbursement upon which Escrow Agent must be a signatory of any agreement related to the release and control of funds."

As such, a plain reading of the Escrow Agreement indicates that Ms. Ghatt agreed to disburse an amount specified by Strategic Capital or Zion Capital from her firm's attorney trust account to an account also identified by Strategic Capital or Zion Capital. In return, Ms. Ghatt would receive $1,000 each month as well as half a percent of any disbursement that requires Ms. Ghatt to sign an agreement relating to the disbursement.

### *Grove Construction Management, LLC and Grove Plaza, LLC*

Kraig Robinson was a partner of Grove Construction Management, LLC, a company owned by himself and Lyle Kenney ("Mr. Kenney") as equal partners. Mr. Robinson stated

5

that Grove Construction Management assists clients in designing buildings. Mr. Robinson's role in Grove Construction Management was to deal with the contractors and engineers as well as supervise the field construction. Around 2008 or 2009, Grove Construction Management wanted to build a 45,000 square foot warehouse building on a piece of property adjacent to the company's current offices. In pursuit of that goal, the company obtained an appraisal of the building, which concluded that the project would cost $5,000,000.

Mr. Robinson and Mr. Kenney from Grove Construction Management, LLC contacted Gene Parrish from New Freedom Group, LLC, who indicated that he knew a company that could assist with funding the warehouse building project. New Freedom Group explained to Grove Construction Management that the funding company, Strategic Capital, required an appraisal and ten percent of the appraisal amount upfront. Therefore, Mr. Robinson anticipated that Strategic Capital would provide the complete funding amount, $5,000,000, as long as Grove Construction Management submitted the appraisal and ten percent of the funding amount, $500,000.

Mr. Robinson spoke with James C. Yates ("Mr. Yates" or "James Yates"), who he had met in either 2011 or 2012 after buying a piece of equipment from him. After discussing the warehouse building project, Mr. Yates agreed to provide $500,000 to secure the funding in exchange for becoming an equity partner of Grove Construction Management, LLC or for a lump sum fee of $100,000.

After Mr. Yates agreed to pay the initial $500,000, Mr. Robinson contacted New Freedom Group and Strategic Capital Enterprises about how the process would work.

6

Gene Parrish from New Freedom Group explained that Mr. Yates's $500,000 would be placed in the Ghatt Law Group's attorney trust account and that nobody would be able to encumber that deposit. As such, Mr. Robinson believed that if the warehouse building project was not funded by February 1, 2015, then Grove Construction Management would submit a written request to the Ghatt Law Group to wire the funds directly to Mr. Yates, refunding him in full. Mr. Robinson testified that it was his understanding that if the deal did go through, then Strategic Capital would release $5,000,000 to Grove Construction Management in order to fund the project and to return $500,000 to Mr. Yates. In other words, Mr. Robinson believed that Mr. Yates's $500,000 would be fully refundable and not be at risk. Mr. Robinson stated that he discussed this with Mr. Yates.

Pursuant to the common goals of funding and building the warehouse building, the parties created a limited liability company named Grove Plaza, LLC. Specifically, the parties executed an Limited Liability Company Agreement on January 25, 2015. The limited liability company agreement included the following members: Strategic Capital Enterprises, Inc.; Kraig Robinson; Lyle Kenney; and New Freedom Group. Each of the members signed the limited liability company agreement with Ken Phillips ("Mr. Phillips") signing on behalf of Strategic Capital Enterprises, Inc. and Gene Parrish signing on behalf of New Freedom Group, LLC.

### Escrow Agent Agreement with Grove Plaza, LLC and Strategic Capital Enterprises

Ms. Ghatt entered into a second "Escrow Agreement" with "Strategic Capital Enterprises, Inc[.], a corporation organized under the laws of New Jersey," "Grove Plaza, LLC, a Utah limited liability company[,]" and the "Ghatt Law Group[.]" The second

7

Escrow Agreement provided an effective date of December 1, 2014.[4]  The Escrow Agreement stated that the "parties hereby appoint the Ghatt Law Group as the Escrow Agent[.]"  Mr. Phillips signed the agreement on December 4, 2014 on behalf of Strategic Capital Enterprises, Inc.  Kraig Robinson signed the agreement on behalf of Grove Plaza, LLC on December 2, 2014.  However, the signature line for the Ghatt Law Group (Escrow Agent) appears blank and undated.[5]

This second Escrow Agreement provided the following purpose of the escrow agreement:

> to hold and to disburse the proceeds of $500,000.00 deposited into escrow by Grove Plaza, LLC to be disbursed to Strategic Capital Enterprises, Inc. once Ghatt Law Group has verified $500,000 has been deposited into a sub-account opened in the name of Grove Plaza, LLC and Ghatt Law Group has delivered 1) CONFIRMATION OF DEPOSIT LETTER, and 2) a copy of the LETTER OF AUTHORIZATION – ACTION REQUIRED document from Citi Private Bank to Grove Plaza, LLC, Strategic Capital Enterprises, Inc., and New Freedom Group, LLC as the two conditions to the release of escrow.

---

[4] There is no explanation in the record why the Escrow Agreement naming Grove Plaza, LLC was dated December 1, 2014 even though the limited liability company agreement forming Grove Plaza, LLC was dated January 25, 2015.

[5] It appears from the record that there are multiple copies of this signature page.  Ms. Ghatt testified that the unsigned version is the original signature page of the second Escrow Agreement.  After a review of the record, this Court can only gather that Ms. Ghatt subsequently submitted a separate signature page to the Commission with her signature. At that time, it appears Ms. Ghatt purported the document to be the official signature page of the second Escrow Agreement.  On this separate signature page, Ms. Ghatt's signature appears to be dated December 10, 2014.

8

The agreement further indicated that the "[d]eposit of $500,000.00 will be used by Strategic Capital Enterprises, Inc. to pay the costs associated with the cash deposit at Citi Private Bank, financial transaction and banking fees related to the JOINT VENTURE[6] acquisition of financing, with any additional escrow proceeds to be disbursed pursuant to this Escrow Agreement."

The Escrow Agreement instructed the Ghatt Law Group, as escrow agent, to provide a "'Notification of the Escrow Cash Deposit' to Grove Plaza, LLC, Strategic Capital Enterprises, Inc[.] and New Freedom Group, LLC ('Exhibit A')" on the same business day that the $500,000 is wired to the Ghatt Law Group's Citibank attorney trust account, ending in number 8589. Within seven days of Ms. Ghatt's confirmation, the agreement indicated that Strategic Capital would deposit $500,000.00 into a "sub-account at Citi Private Bank in the name of Grove Plaza, LLC and cause Citi Private Bank to notify Escrow Agent."

Once Ms. Ghatt verified that Strategic Capital had deposited $500,000 into a Citi Private Bank "sub-account" of her attorney trust account, Ms. Ghatt was to send a "Confirmation of Deposit" and a "Letter of Authorization – Action Required" to all parties and "immediately disburse the $500,000.00 to Strategic Capital Enterprises, Inc. as instructed by an authorized representative of Strategic Capital Enterprises, Inc."

Under a section entitled "Escrow Disbursement Instructions," the second Escrow agreement indicated that the "Parties recognize the sub-account at Citi Private Bank is a sub-account of the Ghatt Law Group. Any and all questions regarding the sub-account or

---

[6] This Escrow Agreement did not define or explain the "joint venture."

9

of the banking relationship of the Ghatt Law Group with Citi Private Bank are to be directed to the Ghatt Law Group. The Ghatt Law Group will accommodate any questions and or verifications regarding the accounts." Further, the agreement provided that "[a]ny attempt to make direct contact with Citi Private Bank without the direct, written consent of the Ghatt Law Group will be cause for immediate termination of the Escrow Agreement and of the related transaction."

The Escrow Agreement also stated that the "Escrow Agent is hereby instructed that if the notification of the $500,000.00 deposited into Grove Plaza, LLC's account at Citi Private Bank is not received by the Escrow Agent within seven (7) days from the date the [cash from Grove Plaza, LLC] is received" in the attorney trust account, then "the Escrow Agent shall immediately return the $500,000.00 by wire transfer to the banking coordinates of Grove Plaza, LLC to the account where the $500,000.00 [] originated."

Pursuant to the stated purpose and provisions of the second Escrow Agreement, the agreement provided an Exhibit A, Notification of the Escrow Cash Deposit, which appears to be an undated version of the notification document that Ms. Ghatt was required to send to all the parties once James Yates wires $500,000 on behalf of Grove Plaza, LLC to the Ghatt Law Group's attorney trust account.

The second Escrow Agreement also has an Exhibit B, Confirmation of Deposit/ Terms of Disbursement, which appears to be an unsigned version of the document Ms. Ghatt was required to send to all parties once she received notice that Strategic Capital had placed $500,000 into a separate sub-account at Citi Private Bank. The Confirmation of Deposit exhibit is dated December 1, 2014 and is to the attention of Kraig Robinson and

10

Grove Plaza, LLC.  However, the letter is addressed "Dear Jim[.]"  The Confirmation of Deposit stated that Ms. Ghatt "*personally verified* the Citi Private Bank Letter of Authorization – Action Required document from Citi Private Bank" and "*ha[d] confirmed*:" (1) A sub-account has been opened in the name of Grove Plaza, LLC at Citibank; (2) $350,000 has been deposited into the account; and (3) the Beneficiary of the sub-account is James Yates.  (Emphasis added).  The Confirmation of Deposit further provided:

> The funds in the account will be released upon the earliest occurrence of one of the following three events: A. The funding of the $5,000,000 loan to Grove Plaza, LLC. . . . B. Should the loan from Strategic Capital Enterprises, Inc. in the amount of $5,000,000 to Grove Plaza, LLC not fund on or before February 1, 2015, the $350,000, upon written request from Grove Plaza, LLC to The Ghatt Law Group, will be wired immediately to James Yates . . . C. The Expire date occurs. Upon expiration of the account the funds will be disbursed to the Beneficiary.

As is clear from Exhibit B, in its unaltered state, the Confirmation of Deposit read that $350,000 had been deposited into a sub-account and that amount would be returned once the $5 million loan did not fund and Mr. Robinson or Mr. Yates submitted a written request for the return of the funds.  Ms. Ghatt later testified that she should have edited this amount to read $500,000 as this was the amount Strategic Capital alleged was required to obtain the loan.

Also attached was Exhibit C, a Letter of Authorization – Action Required, which appears to be a blank version of a document purporting to be a bank institution's

11

authorization of a transfer of funds from one bank account to another.  The header of the Letter of Authorization reads as follows:

> The Bank
> Client Services
> Address of the bank
> New York, New York        10005

In the body of the Letter of Authorization, there are blank spaces for the "Main Account of Investment Firm providing Financial Guarantee" along with the corresponding blank space for the bank account number.  There is also a space for the "Sub-Account Name" and the "Sub-Account Number[.]"  Exhibit C indicated that the "letter is regarding the distribution to the beneficiaries of Borrower and may be used as my Letter of Authorization to make the appropriate distribution of the funds in the above referenced account []."  The letter then has blank spaces for the beneficiary name, beneficiary percentage, and beneficiary address.  The Letter of Authorization included a section stating, "Please indicate how you would like to receive your distribution share (check one)[.]"  The letter also has an already marked box next to the option for transferring to a bank with a line for the beneficiary to put the account name, account number, and routing number.

Exhibit D to the second Escrow Agreement is untitled.  However, the document states that "[t]his is the information that will be used to open the account at Citi Private Bank and for receiving funds."  The document then lists the account name as Grove Plaza, LLC, and the signatory name as Kraig D. Robinson.  Exhibit D then indicates that "upon distribution the funds are to be wired to:" James Yates as beneficiary, under a James C. Yates account name, with a specific account number and routing number.

12

The second Escrow Agreement along with the four exhibits (Exhibit A through Exhibit D) constitute the entire twelve-page agreement between Strategic Capital Enterprises, Inc, Grove Plaza, LLC, and the Ghatt Law Group as Escrow Agent.

*Events following the Escrow Agreements*

On December 3, 2014, Mr. Yates wired $500,000 from his Commonwealth financial network account to the Ghatt Law Group Citibank account, which has an account number ending in 8589. The wire instructions from Mr. Yates specifically noted additional banking information that further credit was to Grove Plaza/Strategic Capital. In addition to Mr. Yates's signature, an advisor/staff of Commonwealth financial network signed and dated the wire request form on December 3, 2014. The Ghatt Law Group's attorney trust account statement from December 2014 reflects that prior to December 3, 2014, the account held $151.73. The statement also showed that the attorney trust account received a funds transfer from James Yates in the amount of $500,000 on December 3, 2014. As such, the attorney trust account statement reflected a balance of $500,151.73 on December 3, 2014.

After Mr. Yates wired the $500,000 to the Ghatt Law Group Citibank account on December 3, 2014, Ms. Ghatt edited and completed the blank exhibits to the second Escrow Agreement. Ms. Ghatt re-dated the exhibits, signed the exhibits, and then sent them to the parties in her role as escrow agent. Specifically, Ms. Ghatt dated Exhibit A, the Notification of the Escrow Cash Deposit, on December 3, 2014. The Notification still had a header noting "EXHIBIT A," and further stated that the "Ghatt Law Group received an Escrow Cash Deposit from Grove Plaza, LLC in the amount of $500,000. These funds will be held as per the terms of the Escrow Agreement between Strategic Capital Enterprises,

13

Inc., Grove Plaza, LLC, and THE GHATT LAW GROUP." Ms. Ghatt testified that she did, in fact, send the dated version of the Notification of the Escrow Cash Deposit to the following parties per the instructions of the second Escrow Agreement: Grove Plaza, LLC, Strategic Capital Enterprises, Inc., and New Freedom Group, LLC.

Ms. Ghatt also completed Exhibit B to the second Escrow Agreement, the Confirmation of Deposit,[7] which Ms. Ghatt dated December 1, 2014. The Confirmation of Deposit stated that it is to the attention of Kraig Robinson and Grove Plaza, LLC. Moreover, the Confirmation of Deposit stated that Ms. Ghatt has "personally verified the Citi Private Bank Letter of Authorization – Action Required document from Citi Private Bank (attached hereto)[.]" The Confirmation of Deposit also provided the following: the Bank Ref Code was 61XXXXXX; that a sub-account had been opened in the name of Grove Plaza, LLC; that $350,000[8] had been deposited into the account; the beneficiary of

---

[7] There appears to be two completed versions of Exhibit B, Confirmation of Deposit/ Terms of Disbursement, in the record. The two versions provided different dates (one dated December 1, 2014 and one dated December 10, 2014), but both appeared on the Ghatt Law Group letterhead and both were signed by Ms. Ghatt. The only significant differences between the two versions is that the December 1, 2014 copy provided that $350,000 had been wired from Mr. Yates to Citibank. Ms. Ghatt later testified that this was a typo that was meant to read $500,000. The December 1, 2014 version still contained the header "EXHIBIT B," which did not appear on the December 10, 2014 version. The December 1, 2014 copy also included Instructions for Distribution, which were absent from the December 10, 2014 copy. In his complaint, Mr. Yates alleged that he received the Confirmation of Deposit dated December 1, 2014, and so this Court will concentrate on that version of the completed Exhibit B.

[8] As stated *supra*, Ms. Ghatt testified that this amount was an error; she further testified that the document should have read $500,000 to reflect the amount Mr. Yates transferred into the Ghatt Law Group Citibank attorney trust account.

14

the sub-account was James Yates; the account was to expire on December 5, 2015; and no third party had access to the account.

The Confirmation of Deposit further stated that the funds in the account would be released on the earliest of one of the following three events: (1) the funding of the $5,000,000 loan to Grove, Plaza, LLC, upon which the $350,000 in the account will be returned to Strategic Capital Enterprises, Inc.; (2) should the loan of $5,000,000 not fund on or before February 1, 2015, the $350,000 would be wired immediately to James Yates upon written request from Grove Plaza, LLC to The Ghatt Law Group; or (3) the expire date occurs, upon which the funds will be distributed to "the Beneficiary[,]" James Yates. In addition, the Confirmation provided "Instructions for Distribution," which stated:

> Should the loan not fund on or before the 1st day of February, 2015 please make a written request for the distribution of the $500,000, attach a copy of the Letter of Authorization – Action Required document with the information for distribution filled in and The Ghatt Law Group shall be responsible for the finds in the amount to be immediately wired to James Yates as per your instruction.

Ms. Ghatt signed the Confirmation of Deposit at the end of the document.

Attached to the Confirmation of Deposit was the completed version of Exhibit C to the second Escrow Agreement: the Letter of Authorization – Action Required. The header provided the Citibank logo followed by Client Services, 111 Wall Street, New York, New York 10005. The Letter of Authorization was dated December 5, 2014. The Letter purported to show that the individually-managed account ("IMA") name was Ghatt Law Group, the primary account number was *****8589, the sub-account name was Grove Plaza, LLC, the sub-account number was 4488-805, and the bank reference number was

15

6100052992.[9]  The Letter stated that the beneficiary name was Grove Plaza, LLC and that the beneficiary percentage as 100% of the $500,000.  There were blank spaces left open for the beneficiary to indicate how he would like to receive the distribution.

After Ms. Ghatt sent the completed versions of the exhibits attached to the second Escrow Agreement to the parties, Ms. Ghatt started wiring money out of The Ghatt Law Group attorney trust account to Strategic Capital Enterprises beginning on December 5, 2014.  The Ghatt Law Group attorney trust account statement from December 2014 specifically showed that Ms. Ghatt[10] wired $50,000 out of her attorney trust account to Strategic Capital Enterprises on December 5, 2014.  Subpoenaed documents related to The Ghatt Law Group attorney trust account from Citibank also revealed that Ms. Ghatt transferred another $50,000 to a Morgan Stanley account owned by Zion Capital on December 8, 2014.  The subpoenaed Citibank documents further showed that Ms. Ghatt wired out $399,860.83 to Strategic Capital Enterprises on December 9, 2014.  Overall, Ms. Ghatt disbursed a total of $449,860.83 to Strategic Capital and $50,000 to Zion Capital, which totals $499,860.83.[11]  After Ms. Ghatt wired the money to Strategic Capital and Zion

---

[9] Although this is the bank reference number as it appears on the Letter of Authorization, the Confirmation of Deposit that Ms. Ghatt sent to Mr. Yates stated that the bank reference code was 61XXXXXX.  There is nothing in the record or Ms. Ghatt's testimony that explains the discrepancy between the suggested eight-digit bank reference code on the Confirmation of Deposit and the ten-digit bank reference number on the Letter of Authorization.

[10] Ms. Ghatt testified that she was the one who wired the money out of the attorney trust account.

[11] The record also showed that there were fees associated with the transfer of funds out of the attorney trust account.  These fees totaled $79.00.  After subtracting the transfer fees,

Capital, Ms. Ghatt received a funds transfer in the amount of $5,000 into the Ghatt Law Group attorney trust account from Strategic Capital Enterprises for her services as an escrow agent.[12]

In addition to the specific wire transfers of Mr. Yates's $500,000, Ms. Ghatt continued to accept wire transfers related to other investments and then disbursed the funds to accounts held by either Strategic Capital Enterprises or Zion Capital. These transactions continued from January 2015 to May 2015, at which time the attorney trust account was closed. At one point, Ms. Ghatt incurred a negative balance on the Ghatt Law Group attorney trust account in January 2015 when she disbursed $125,000 twice.[13]

Ms. Ghatt testified that she received instructions from Strategic Capital in emails and phone calls to wire certain amounts transferred into her attorney trust account to other accounts. Therefore, the hearing judge found that Ms. Ghatt's true role as escrow agent was her unquestioning use of the Ghatt Law Group attorney trust account, which was ultimately at the disposal of Strategic Capital and Zion Capital. In addition, the hearing judge found by clear and convincing evidence that Ms. Ghatt's argument that her actions were governed by the two escrow agreements and that she followed those instructions was not credible because she did not enter into the escrow agreement with Grove Plaza, LLC

---

that leaves $60.17 of Mr. Yates's $500,000 that remained in Ms. Ghatt's attorney trust account.

[12] *See supra* the Escrow Agreement provision for escrow fees at 5.

[13] Ms. Ghatt testified that she accidentally disbursed $125,000 twice and only intended to disburse this amount once.

17

until December 10, 2014, by which time she had already received and disbursed Mr. Yates's $500,000 from the attorney trust account.

Ms. Ghatt also made debit card purchases from the attorney trust account after Mr. Yates had wired $500,000 into the account. Specifically, Ms. Ghatt made a $13.28 and purchase at Old Navy on December 3, 2014 and a $132.62 purchase from Amazon on December 9, 2014. In addition, Ms. Ghatt made an ATM withdrawal of $60 on December 12, 2014 and another ATM withdrawal of $40 on December 17, 2014. Ms. Ghatt continued to make additional ATM withdrawals and conduct personal transactions from December 2014 to May 2015. As such, the hearing judge found by clear and convincing evidence that Ms. Ghatt improperly used the Ghatt Law Group attorney trust account as her personal bank account.

The hearing judge also found by clear and convincing evidence that there was never a "sub-account" as described in the second Escrow Agreement, Confirmation of Deposit, or the Letter of Authorization. The hearing judge further found that Ms. Ghatt never opened a sub-account under her attorney trust account. Instead, Ms. Ghatt contended that someone other than her was to open the sub-account and that she relied on the Confirmation of Deposit and Letter of Authorization dated December 1, 2014 as evidence that a sub-account with $500,000 was created. The hearing judge found that the Confirmation of Deposit and Letter of Authorization did not confirm any such sub-account. As such, the hearing judge found by clear and convincing evidence that Ms. Ghatt made multiple misrepresentations as to the existence of a sub-account when she sent the December 1, 2014 Confirmation of Deposit and Letter of Authorization to the parties, which indicated

18

in pertinent part: "*I have personally verified* the Citi Private Bank Letter of Authorization – Action Request document from Citi Private Bank (attached hereto) *and have confirmed*: 1. A sub-account has been opened in the name of Grove Plaza, LLC at Citibank." (Emphasis added).

The $5,000,000 loan did not fund on February 1, 2015. Two days later, Mr. Robinson, Mr. Kenney, along with Strategic Capital and New Freedom Group signed a "resolution" that extended the last day for funding to February 5, 2015. The resolution specified that Strategic Capital would provide $5,500,000 to Grove Plaza, LLC of which $500,000 would be wired to Mr. Yates to repay his deposit in escrow. Mr. Yates was not a party to the resolution and did not sign the resolution. Subsequently, the loan did not fund or close on February 5, 2015 despite the averments in the resolution.

### Mr. Yates's Attorney Communications with Ms. Ghatt & the Utah Civil Lawsuit

After the loan to Grove Plaza, LLC did not fund and Mr. Yates did not receive his $500,000 from Ms. Ghatt or Strategic Capital, Mr. Yates retained Thomas Seiler, Esquire ("Mr. Seiler") to assist him in recovering his funds. Mr. Seiler reviewed the Confirmation of Deposit and Letter of Authorization, which Mr. Yates had previously received from Ms. Ghatt. On February 24, 2015, Mr. Seiler sent Ms. Ghatt an email, which stated that he represented Mr. Yates and requested information about Mr. Yates's funds. The next day, Mr. Yates and Mr. Robinson signed and completed the Letter of Authorization, which provided that the beneficiary, Grove Plaza, LLC, should indicate how they would like to receive the distribution. Mr. Yates chose to transfer the funds to his bank, filled out the bank name, account name, account number, and routing number. Mr. Robinson and Mr.

19

Yates also executed a second document that requested Ms. Ghatt to return the $500,000 to Mr. Yates.

On behalf of Mr. Yates, Mr. Seiler sent Ms. Ghatt a letter requesting the return of Mr. Yates's $500,000. Attached to the letter was the Letter of Authorization (completed and signed by Mr. Yates and Mr. Robinson), the Confirmation of Deposit dated December 1, 2014, and Mr. Seiler's February 24, 2015 email to Ms. Ghatt. On the same day, Ms. Ghatt responded to the letter, confirming that she was "processing it and [would] get back to [him] within 48 hours with further instructions and actions." Although Mr. Seiler again expressed concern over the delay in the return of Mr. Yates's $500,000 and requested an immediate return, Ms. Ghatt either responded with conflicting explanations or did not respond at all.

On March 3, 2015, Mr. Seiler emailed Respondent and asked for a detailed explanation of why she had not returned Mr. Yates' funds as instructed by the Letter of Authorization signed by Mr. Yates and Mr. Robinson. Ms. Ghatt replied on the same date, stating that she "understand[s] the funds are being returned and the account, per the ARD, has been funded. Can you please check with Mr. Robinson also to confirm?" Mr. Seiler responded, explaining that Mr. Yates had not received his returned funds and Mr. Robinson confirmed that no loan had funded. Mr. Seiler again demanded to know what Ms. Ghatt had done with the $500,000 and why she refused to wire the money to Mr. Yates as instructed. In response, Ms. Ghatt stated that her "escrow agreement is with a three member [sic] partnership and per that agreement, release of the funds can only be authorized by all or the majority of that three member/parties . . . *I did not spend your*

20

*client's money, did not authorize any party to take it from escrow neither [sic] did I personally give not give [sic] it to anyone*."  (Emphasis added).

Mr. Seiler filed a civil suit in the Fourth District Court, Utah County, Utah on Mr. Yates' behalf in order to recover the $500,000.  The civil suit alleged theft and breach of contract against Strategic Capital, New Freedom Group, Grove Plaza, Gene Parrish, Ken Phillips, Kraig Robinson, and Lyle Kenney.  In addition, the civil suit alleged that the Ghatt Law Group and Ms. Ghatt committed theft, breach of contract, breach of fiduciary duty, and legal malpractice.[14]  Pertinent to this attorney grievance matter, Ms. Ghatt filed several initial disclosures with the Utah court, stating that all parties to the escrow agreements knew that Ms. Ghatt never had control of the $500,000, that Ms. Ghatt never had control of the funds or the ability to remove the funds, and that Citibank was responsible for wiring the $500,000 to Mr. Yates rather than Ms. Ghatt or the Ghatt Law Group.  The hearing judge found that Ms. Ghatt made knowing and intentional misrepresentations to the Utah court, noting that Ms. Ghatt had control over some or all of Mr. Yates's funds, which is shown by the Ghatt Law Group attorney trust account transactions.

On April 23 and 24, 2015, Mr. Seiler sent two more emails to Ms. Ghatt asking for an accounting of the $500,000.  Ms. Ghatt responded on both dates, first stating that Mr.

---

[14] Ultimately, the Utah court granted a motion for summary judgment in favor of Mr. Yates and against Ms. Ghatt and the Ghatt Law Group.  The Utah District Court specifically found that Ms. Ghatt breached her fiduciary duties as escrow agent, awarding Mr. Yates damages in the amount of $500,000.  However, Mr. Yates still has not received the $500,000 damages award from the Ghatt Law Group or Ms. Ghatt.

21

Yates's money was delayed and that she would try to show Mr. Seiler and Mr. Yates the escrow account holding the money. Second, Ms. Ghatt emailed Mr. Seiler stating:

> *I have attached a screen grab of the client holding account at Citi linked to Morgan Stanley which shows about 3.4M in various client holdings, and within that amount is Mr. Yates' [sic] $500,000.* I blurred out bank account numbers for security and confidentiality reasons.
>
> I finally got the go ahead from Strategic to release it back to him.
>
> You will need to withdraw your complaint in court and have Mr. Yates withdraw his bar counsel complaint as well . . .
>
> Please confirm your intention to withdraw all complaints upon you client receiving his funds today.

(Emphasis added).

Ms. Ghatt attached to her email a "screen grab"[15] of her Citi bank web accounts, showing an external personal investments account with an amount of $3,888,493.28. The external account was entitled Morgan Stanley Online (ClientServ). The hearing judge found that Ms. Ghatt led Mr. Seiler to believe that the Citi accounts held Mr. Yates's funds. Moreover, the hearing judge further found that Mr. Seiler believed that Ms. Ghatt was threatening him by suggesting that the only way Mr. Yates would receive his $500,000

_____

[15] Ms. Ghatt used the phrase "screen grab" to refer to a screenshot. This Court has previously explained that a "'screenshot' is an image that depicts only the content of the computer screen." *Sublet v. State*, 442 Md. 632, 638 n. 3 (2015). We will use the terms screen grab, screenshot, and screen capture interchangeably consistent with how the terminology was used in the record.

would be if Mr. Seiler dismissed the lawsuit in Utah. Ultimately, the hearing judge found by clear and convincing evidence that Ms. Ghatt made a knowing and intentional misrepresentation regarding the whereabouts of Mr. Yates's $500,000 by sending the screen grab to Mr. Seiler.

### *Attorney Grievance Complaint & Bar Counsel's Investigation*

Mr. Seiler also assisted Mr. Yates with submitting to Bar Counsel an attorney grievance complaint, which alleged that Ms. Ghatt was improperly withholding $500,000 that was wired to her attorney trust account. Specifically, Mr. Yates explained that Ms. Ghatt was required to return the $500,000 to Mr. Yates once the loan to Grove Plaza, LLC did not fund on or before February 1, 2015. On March 30, 2015, Bar Counsel forwarded the complaint to Ms. Ghatt and requested a written response.

Ms. Ghatt submitted that written response to Bar Counsel on April 22, 2015. Ms. Ghatt's written response stated, in part, that "[o]n more than one occasion, I let Mr. Yates' [sic] attorney know that I did NOT spend his clients' [sic] money nor did I give it away [nor] caused it to be taken or used by another party. (A screen capture of my bank statement showing the funds availability is attached.)" The screen capture attached to the written response to Bar Counsel was similar to the screen grab Ms. Ghatt had sent to Mr. Seiler. Both documents purport to be Ms. Ghatt's Citibank account. However, the amounts in the two business checking accounts had changed. In addition, the names of the business checking accounts had been changed to "Escrow Operating" and "Strategic Capital Enterp[.]" The amount held in the business checking account named Strategic Capital Enterprises was blurred out. The external personal investments account still showed the

23

same balance of $3,888,493.28, but the name was blurred out in such a way that "(Client Serv)" was the only portion of the external account name revealed. Ms. Ghatt later testified that the money in the external personal investments account was not being held by her, were not available to her, and was instead held by her brother, Mr. Jalloh. As such, the hearing judge found by clear and convincing evidence that Ms. Ghatt made a knowing and intentional misrepresentation to Bar Counsel that she was holding the $500,000 in an account shown in the screen capture attached to her response.

After Ms. Ghatt submitted her written response to the attorney grievance complaint on April 22, 2015, she wrote a subsequent letter to Bar Counsel on July 9, 2015. The second letter to Bar Counsel stated that the $500,000 had either been transferred to her brother, Mr. Jalloh, or to Strategic Capital Enterprises.

In conducting their investigation, Bar Counsel requested all bank records and bank statements for the Ghatt Law Group attorney trust account, ending in 8589, as well as the sub-account number 4488-805. After Ms. Ghatt failed to respond to the request, Bar Counsel again sent communications to Ms. Ghatt, asking why she allowed her brother to have access to the $500,000 after she represented to Mr. Yates that the funds would be held in an escrow account and whether that violated the MLRPC. Ms. Ghatt finally responded by stating that Mr. Jalloh did not have access to the funds in the attorney trust account, enclosing only the first Escrow Agreement with "the Chore Group, LLC" and monthly statements from the attorney trust account.

During Ms. Ghatt's December 21, 2015 sworn statement and September 5, 2017 deposition, Ms. Ghatt testified to the following: (1) she had never reported her Citibank

attorney trust account in her annual IOLTA reporting requirements because she did not realize it was an attorney trust account; (2) that she was simply serving as a pass through agent, holding the funds in her attorney trust account for a short period of time while she could confirm a sub-account, and then pass the funds out of her attorney trust account; (3) that she did not realize that she was involved in a fraudulent scheme until after she had signed the escrow agreements; (4) that she believed Citibank authorized Strategic Capital to open a sub-account under the Ghatt Law Group attorney trust account without her authorization; (5) that Mr. Phillips informed Ms. Ghatt that they had orally extended the date to finish the transaction with Grove Plaza, LLC; (6) that Mr. Jalloh represented to Ms. Ghatt that Mr. Yates had received his $500,000; (7) that Ms. Ghatt received a document from Citibank stating that a sub-account with $500,000 had been opened by Strategic Capital for the benefit of Mr. Yates; (8) that Mr. Jalloh linked his Morgan Stanley account, holding approximately $3,800,000, to her attorney trust account but that neither she nor Mr. Jalloh had access to the account or could liquidate that amount; (9) that Zion Capital Ventures paid her $100 on January 15, 2015 for fees related to the escrow agreement; (10) that she had helped with five or six transactions involving Strategic Capital or Zion Capital; and (11) that Ms. Ghatt never requested a statement of transactions for a sub-account and never went into a local branch to inquire about the existence of a sub-account.

The hearing judge found by clear and convincing evidence that Ms. Ghatt was aware that the Ghatt Law Group attorney trust account was, in fact, an attorney trust account. In addition, the hearing judge found that Ms. Ghatt made certain statements to Bar Counsel that she knew were false.

25

*Attorney Grievance Hearing*

During the attorney grievance hearing, Bar Counsel called Mr. Seiler, Mr. Robinson, and Mr. Kenney as witnesses to testify about the events before and after Mr. Yates wired $500,000 to the Ghatt Law Group attorney trust account for the purpose of assisting Grove Plaza, LLC to obtain a loan with the help of Strategic Capital Enterprises. In addition to the three witnesses, Bar Counsel offered, and the hearing judge admitted, Professor James Byrne as an expert in the field of advanced fee schemes. Professor Byrne testified as to advanced fee schemes generally as well as whether the events leading Mr. Yates to wire $500,000 to the Ghatt Law Group attorney trust account constituted a fraudulent scheme.

Professor Byrne specifically testified that an advanced fee scheme is a species of fraud. In addition, Professor Byrne testified that, although there is no formal definition of advanced fee scheme, all such schemes share the following elements: (1) money is solicited and induced to be paid in advance of any promised return; (2) promises and security that the funds are safe, risk-free and that the funds will be returned or the funds will lead to rewards; (3) a disproportionate promised return or reward; (4) the source of the return or reward is obscure; (5) there are distractors used to shift the victim's focus from the crucial questions regarding the complex transactions and complex instruments; (6) secrecy; (7) excuses, offers, suggestions, or alternatives after the promised funds and rewards are not forthcoming.

With respect to one of the key elements, Professor Byrne explained that the safety or security is often provided by way of promises from banks, or promises embodied in the

instruments used by banks, such as letters of credit and independent guarantees. He testified that the victims of the fraudulent schemes cannot determine whether these sophisticated documents are authentic or not. Significantly, Professor Byrne stated that this security is more often being provided by way of an attorney trust account and escrow agreements:

> The reputation, I think, generally deserved of the legal profession in ensuring the integrity of escrow accounts gives it a certain flavor that commands trust and respect.
>
> Most people [] have some experience with escrow if only in terms of personal mortgage and so if an attorney is holding the money[,] and holding it particularly in an escrow account, victims have a sense that this is something on which they can rely and know that their investment is relatively risk-free. They're sure that they're going to get their money back, and that has a powerful factor.
>
> It's something that has been increasing in my experience of the 3,000 or so schemes that I've looked at in my career. I would say that there have been maybe [300] to 400, maybe 500 of them[,] have involved attorney escrow accounts and that number has been relatively recent and, in my experience, increasing. So it's a very powerful scheme on the part of fraudsters to induce victims to depart with their money.

Professor Byrne also testified that he reviewed the documents related to the transaction for which Mr. Yates wired $500,000 into the Ghatt Law Group attorney trust account. First, Professor Byrne examined the Confirmation of Deposit document in which Ms. Ghatt informed Mr. Yates, Mr. Robinson, and Grove Plaza, LLC that she had personally verified that a sub-account had been created under the name Grove Plaza, LLC at Citibank. Professor Byrne stated that the document looked immediately suspicious due to the terms "verify" and "confirm." Specifically, Professor Byrne testified that he was

27

concerned about the Confirmation of Deposit's statement that Ms. Ghatt had confirmed that $350,000[16] had been deposited into a sub-account. He explained that it would be hard for anyone besides the bank to verify and confirm that funds had been deposited into an account and that the funds remain in that account.

In addition, Professor Byrne explained that Citibank, along with all of the banks that he has examined, do not operate something called a "sub-account." He further testified that "sub-account" is a term that he has often encountered in advanced fee schemes; a sub-account is used to suggest that there was an isolation of funds, adding assurance that the funds will be returned or cannot be reached. Overall, Professor Byrne stated that the presence of the term "sub-account" on the Confirmation of Deposit document suggests to him that the document is not authentic and could be part of an advanced fee scheme.

Professor Byrne further testified that he had never seen the statements on the Confirmation of Deposit to the effect that "no third-party had access to the account nor can it be encumbered by a third-party," that the "account expires on [a certain date]," and that "Citibank is taking full bank responsibility to insure the funds in the sub-account remain in place and are available to the listed beneficiaries until disbursed" do not appear as terminology in the commercial banking industry. Instead, Professor Byrne explained that these types of statements often appear in advanced fee schemes that involve escrow accounts.

---

[16] As noted on page 14 footnote 8, *supra*, Ms. Ghatt testified that the $350,000 was a typo that should have read $500,000.

Overall, Professor Byrne summarized that: (1) the Confirmation of Deposit is not a document that would appear in a real commercial transaction; (2) the document was likely drafted, instead, by someone who didn't understand banking transactions; and (3) the Confirmation of Deposit is the type of document that would play a role in an advanced fee scheme, seeking to induce an investor to put money into an account.

Professor Byrne also reviewed the Letter of Authorization that Ms. Ghatt sent to Mr. Yates; this was the same document that Mr. Yates subsequently filled out with instructions on how to return his $500,000 with his signature and Mr. Robinson's signature. During his testimony, Professor Byrne explained that this document is not one that Citibank would generate despite the header that indicated it was from the bank. Instead, Professor Byrne testified that the Letter of Authorization appears to him "like something that was [] rigged together out of a Citi form that, to me, looks suspicious."

Professor Byrne also testified about how attorney trust accounts are misused for purposes of advanced fee schemes. Specifically, Professor Byrne explained that large amounts of money would come in and go out of attorney trust accounts when they were used as a tool in the fraudulent scheme. Professor Byrne compared this misuse of attorney trust account as

> operating almost like a revolving door. The victim is given the notion that this money is safe, it's secured, it will not be touched . . . . The attorney looks to the fraudster for instructions, follows those instructions without regard to whoever put the money in and quite typically, it's literally a revolving door. The money comes in one day and goes out the next day without any regard to whatever the underlying transaction may be, which, of course, gives rise to an excuse or a defense that "well, I was following the instructions of my

29

client who is the one who caused the account to be set up and I had no knowledge of whether this was proper or not.

(Cleaned up).

Professor Byrne had an opportunity to review the sworn statement of Ms. Ghatt as well as the bank records of the Ghatt Law Group attorney trust account. Professor Byrne testified that the sums going in and out of the Ghatt Law Group attorney trust account were striking and concerning given the proximity in timing of funds coming into the account and funds going out. Specifically, Professor Byrne stated that the account showed "on the one hand, relatively minor sums, some of which appear to be personal and then these large sums coming in and going right out and that's a pattern I've seen in situations where attorney escrow accounts have been abused."

In sum, Professor Byrne stated that it was his professional opinion, within a reasonable degree of professional certainty and based on the examination of the materials he discussed in his testimony, that the Ghatt Law Group attorney trust account was misused "to induce investors to advance funds in connection with a fraudulent scheme."

On cross-examination, Professor Byrne testified that it was certainly possible for a lawyer to be a victim in a fraud that misuses an attorney trust account. However, Professor Byrne clarified that the "question is whether or not, in my opinion, the attorney has knowingly lent him or herself to the use of the account in a way that would let his or her professional reputation add to the credibility without doing the diligence that's necessary in order to assure them that this was a credible or reasonable exercise. *So it's possible to*

30

*both be victimized and also to allow one's self to be misused in the same action*." (Emphasis added) (cleaned up). Professor Byrne expounded on this distinction:

> it's one thing for a normal genuine commercial transaction to be structured in a way that's based on it's nuances there's misuse, and it's another where an account is effectively being used as a revolving door for money to go in and money to go out. Once, maybe that's understandable, but where it happens a number of times, it is not. I mean, at the very least it would seem to me that professional responsibility would require a much higher degree of due diligence to avoid the possibility of facilitating money laundering which is what, frankly, this looks like, money being moved in, money being moved out.

The hearing judge accepted the observations and expert opinion of Professor Byrne. In addition, the hearing judge found by clear and convincing evidence that Ms. Ghatt participated in an advanced fee scheme to induce Mr. Yates and Grove Plaza, LLC to wire $500,000 by misusing her attorney trust account and failing to safeguard the funds.

After Bar Counsel's case, Ms. Ghatt testified in her own behalf.[17] In her own testimony, Ms. Ghatt stated that she was misled by her brother, Mr. Jalloh, and Mr. Phillips of Strategic Capital in entering as escrow agent to the various transactions, including the one in which Mr. Yates wired $500,000 to assist Grove Plaza, LLC. Ms. Ghatt also stated that she called a number, purporting to be a Citibank number, which she received from her brother and Ken Phillips. Ms. Ghatt testified that she called this number to verify whether a sub-account was created to guarantee Mr. Yates's $500,000 and available as a refund

---

[17] After testifying, Ms. Ghatt also called her husband, Dave Ghatt, as a character witness. Mr. Ghatt testified that Ms. Ghatt was a good person and a hard worker. He testified that he did not believe she was the type to be involved in fraud

31

should the loan to Grove Plaza, LLC not materialize. However, Ms. Ghatt did not explain what she was told by the alleged Citibank employee. Moreover, Ms. Ghatt conceded that it was a fake number and that she did not ever speak to a real Citibank employee before sending the Confirmation of Deposit and Letter of Authorization to Mr. Yates.

Ms. Ghatt also testified that she relied on the second Escrow Agreement, which stated that the escrow agent was to disburse the $500,000.00 deposited into escrow directly to Strategic Capital Enterprises, when she wired Mr. Yates's $500,000 from her attorney trust account to Strategic Capital Enterprises. Ms. Ghatt also testified that her brother, Mr. Jalloh, sent her the screenshot of certain funds, allegedly containing the $500,000 owed Mr. Yates, in an account purportedly linked to the Ghatt Law Group attorney trust account; she then "passed that on to Mr. Seiler[.]" Ms. Ghatt stated that in the time between Mr. Yates had wired the $500,000 into the Ghatt Law Group attorney trust account and her communications with Mr. Seiler, she believed that she had total control over the $500,000 in a sub-account. She further testified that she relied on false statements from her brother and Mr. Phillips about if and when Mr. Yates would receive his $500,000 back, and then relayed those statements to Mr. Seiler as attorney for Mr. Yates.

On cross-examination, Ms. Ghatt conceded that she should have verified that $500,000 in a sub-account was available and was in her control before sending her response to Bar Counsel, which stated in pertinent part that "[o]n more than one occasion, I let Mr. Yates' [sic] attorney know that I did NOT spend his clients' [sic] money nor did I give it away [nor] caused it to be taken or used by another party. (A screen capture of my bank statement showing the funds availability is attached.)" Ms. Ghatt also conceded that she

32

did not immediately inform Mr. Seiler, Mr. Yates, or Bar Counsel that she had entered into a prior escrow agreement with Strategic Capital Enterprises and Zion Capital, that her brother, Mr. Jalloh, had linked the account with over $3.8 million to the Ghatt Law Group attorney trust account, or that her brother had sent her the screenshots of the accounts.

Ms. Ghatt also testified with regard to the specific transactions in the Ghatt Law Group attorney trust account. During cross-examination, she stated that "I did what Strategic Capital told me to do. I wired to who they told me to do because they were the ones authorized to have the funds." Specifically, Ms. Ghatt testified that after Mr. Yates wired the $500,000 to the attorney trust account, she first wired $50,000 to Strategic Capital and then wired $50,000 to a Morgan Stanley account that was not Strategic Capital; Ms. Ghatt stated that it was, instead, "an account that Strategic Capital gave me instructions to wire the funds to. . . . that's the account per their instructions that I was supposed to send that to." (Cleaned up). Ms. Ghatt also testified that there was "no requirement that Strategic Capital identif[y] who specifically gets the fees." In sum, Ms. Ghatt testified that she would follow Strategic Capital's, or Mr. Phillip's, instructions on where to wire Mr. Yates's money regardless of whether it was being wired to an account owned by Strategic Capital.

In addition to the specific transactions, Ms. Ghatt also testified that Strategic Capital paid her $5,000 for her duties as an escrow agent in which she was owed one-half of one percent of any disbursement that she did for Strategic Capital. In addition to the transactions involving the $500,000 wired from Mr. Yates, Ms. Ghatt also testified that she wired money to Strategic Capital and Zion Capital after receiving certain large sums into

33

the attorney trust account for separate business deals unrelated to Grove Plaza, LLC. Ms. Ghatt further testified that the attorney trust account received large sums of money for deals related to Strategic Capital after Mr. Yates had sent her the completed Letter of Authorization with wire instructions and Mr. Seiler had sent emails demanding a return of the $500,000. Ms. Ghatt stated that she wired those funds immediately out of the attorney trust account despite having knowledge that Mr. Yates sought return of funds from Strategic Capital. Ultimately, Ms. Ghatt testified that when she entered into the escrow agreements, she believed the transactions to be legitimate, but realized it was not legitimate when she could not access the sub-account to return the $500,000 to Mr. Yates.

During cross-examination, Ms. Ghatt also conceded that she was making personal transactions using her attorney trust account, including ATM withdrawals and debit card purchases for clothes and food. At the end of Ms. Ghatt's testimony and cross-examination, the hearing judge asked Ms. Ghatt whether she would agree that she, at the very least, misused the attorney trust account. In a labored response, Ms. Ghatt ultimately stated yes, that she conceded that she was responsible for misusing the attorney trust account.

## STANDARD OF REVIEW

This Court reviews a hearing judge's findings of fact for clear error, giving due regard to the hearing judge's opportunity to assess the credibility of the witnesses. Md. Rule 19-741(b)(2)(B). *See also Attorney Grievance Comm'n of Maryland v. Dyer*, 453 Md. 585, 643, *cert. denied*, 138 S. Ct. 508 (2017). We review a hearing judge's conclusions of law *de novo* without deference. Md. Rule 19-741(b)(1); *Attorney Grievance*

34

*Comm'n of Maryland v. Shuler*, 443 Md. 494, 501 (2015). This Court determines whether clear and convincing evidence establishes that a lawyer violated an MLRPC. Md. Rule 19-727(c) ("Bar Counsel has the burden of proving the averments of the petition by clear and convincing evidence.").

## DISCUSSION

Bar Counsel does not except to any of the hearing judge's findings of fact or conclusions of law. However, Respondent takes exception to both the judge's findings of fact and conclusions of law.

At the outset we will note that the Respondent takes great issue with the hearing judge's findings of fact and recommended conclusions of law because the hearing judge "essentially adopted the Commission's proposed findings of fact and conclusions of law." However, this Court has consistently made clear that a hearing judge in an attorney grievance matter may adopt one party's filings in full as long as the hearing judge concludes that the pleading reflects his or her own independent factual findings and legal conclusions proven by clear and convincing evidence. *Attorney Grievance v. Joseph,* 422 Md. 670, 696 (2011) ("A judge hearing an attorney grievance matter does not need to meld together his or her own opinion, . . . but may adopt one party's filing in its entirety, as long as it accurately reflects the judge's independent factual findings, proven by clear and convincing evidence at the hearing, and the legal conclusions flowing therefrom."); *Attorney Grievance Comm'n of Maryland v. Hodes*, 441 Md. 136, 180 (2014); *Attorney Grievance Comm'n of Maryland v. Davy*, 435 Md. 674, 696 (2013); *Attorney Grievance Comm'n of Maryland v. Barton*, 442 Md. 91, 129 (2015).

35

## A.    *Exceptions to the Hearing Judge's Findings of Fact*

Ms. Ghatt notes several exceptions to the hearing judge's factual findings.  In all of these exceptions, Ms. Ghatt primarily argues that the hearing judge did not properly consider that she was fulfilling her duties as escrow agent by following the specific and limited directions of the two escrow agreements when she disbursed Mr. Yates's $500,000 to Strategic Capital Enterprises immediately after Mr. Yates had wired the funds to the Ghatt Law Group attorney trust account.

Specifically, Ms. Ghatt first excepts to the hearing judge's finding that she was required to hold Mr. Yates's $500,000 until the $5,000,000 loan was funded to Grove Plaza, LLC despite the fact that two escrow agreements contained clear directions that escrow agent was to immediately disburse the $500,000 to Strategic Capital.  In doing so, Ms. Ghatt argues that the hearing judge ignored critical language in the escrow agreements.

The hearing judge made the following explicit finding of fact: "The undisputed evidence was that Respondent disbursed the funds in ways not authorized pursuant to the terms set forth in the [Letter of Authorization.]"  To the extent that Ms. Ghatt excepts to this finding of fact, the exception is overruled.  Although the Escrow Agreement with Grove Plaza, LLC and Strategic Capital does direct Ms. Ghatt to disburse the $500,000 to Strategic Capital, the Escrow Agreement also specifically states that Ms. Ghatt was to disburse the funds only "*once Ghatt Law Group has verified $500,000 has been deposited into a sub-account* opened in the name of Grove Plaza, LLC[.]"  As the hearing judge properly found, there was absolutely no evidence that a sub-account was opened in the name of Grove Plaza, LLC.

36

Ms. Ghatt testified that she relied on the Letter of Authorization, which she subsequently sent to Mr. Yates, for her belief that a sub-account was in fact created. However, the Letter of Authorization and the Escrow Agreement both make plain that the sub-account held for the benefit of Mr. Yates and Grove Plaza, LLC was a sub-account of the Ghatt Law Group attorney trust account. Specifically, the second Escrow agreement indicated that the "Parties recognize the sub-account at Citi Private Bank is a sub-account of the Ghatt Law Group. Any and all questions regarding the sub-account or of the banking relationship of the Ghatt Law Group with Citi Private Bank are to be directed to the Ghatt Law Group. The Ghatt Law Group will accommodate any questions and or verifications regarding the accounts." Further, the agreement provided that "[a]ny attempt to make direct contact with Citi Private Bank without the direct, written consent of the Ghatt Law Group will be cause for immediate termination of the Escrow Agreement and of the related transaction." Ms. Ghatt had notice and understanding that the sub-account was supposed to be created under her attorney trust account. As such, Ms. Ghatt was required to do more than rely on a Letter of Authorization in order to confirm and personally verify that a sub-account was created.

In the conclusions of law, the hearing judge also stated that the "Respondent failed to hold funds in that or any other properly designated trust account until the loan was funded and/or the funds returned to Mr. Yates." To the extent that Ms. Ghatt intended to

37

except to this finding,[18] the exception is overruled. As we have noted, Ms. Ghatt is correct that the Escrow Agreement with Grove Plaza, LLC and Strategic Capital did instruct her to disburse the $500,000 from her attorney trust account to Strategic Capital after she verified that a sub-account was created under her attorney trust account. However, Ms. Ghatt also had a "duty to act with the care of a professional fiduciary for any property held by an attorney on behalf of third persons." *Attorney Grievance Comm'n of Maryland v. Johnson*, 409 Md. 470, 492 (2009). By agreeing to receive the funds as well as sending Mr. Yates the Confirmation of Deposit and Letter of Authorization, Ms. Ghatt assumed the role of a fiduciary for Mr. Yates's funds and the corresponding responsibility of safeguarding those funds. *See id.* at 494 (holding that an attorney "assumed the role of a fiduciary" for a third person's funds after signing a document, which stated that to the best of his knowledge the funds received had been or would be disbursed by the attorney). As a fiduciary of those funds, Ms. Ghatt was required to either hold and safeguard the money in her attorney trust account or provide Mr. Yates with a complete disclosure and explanation of what will happen to his funds as outlined in the escrow agreement, how his funds will be safeguarded by a sub-account, and how she had personally confirmed that the sub-account was created. Because Ms. Ghatt failed to do so, her exception as to this finding is overruled.

---

[18] We also note that this statement appeared in the hearing judge's conclusions of law. As such, this statement was not an explicit finding of fact that the hearing judge found by clear and convincing evidence.

Ms. Ghatt also excepts to the hearing judge's "decision to insert itself into a fully executed Escrow Agreement and apply brand new additional duties and responsibilities that were not anticipated." However, the hearing judge never made the finding that Ms. Ghatt was required to perform duties beyond those contained in the Escrow Agreement. Therefore, this exception is without merit and is overruled. *See Attorney Grievance Comm'n of Maryland v. Smith*, 457 Md. 159, 212 (2018) ("Thus, the exception is without merit, and therefore overruled, because the hearing judge never made the finding that respondent [now excepts to.]")

Next, Ms. Ghatt excepts to the hearing judge's "refusal to acknowledge and recognize that [Mr.] Kenney and [Mr.] Robinson ratified their own understanding that the funds were properly released to Strategic because [] they signed a resolution" and "elected to ignore the evidence on the [r]ecord that shows [Mr.] Kenney and [Mr.] Robinson had ample time and opportunity to review the Escrow Agreement[.]" There is nothing in the findings of fact or conclusion of law that indicates the hearing judge ignored the fact that Mr. Kenney and Mr. Robinson of Grove Plaza, LLC entered into a resolution with Strategic Capital. In fact, the hearing judge specifically outlined and detailed the events leading up to the resolution, the terms of the resolution, and the parties to the resolution in her findings of fact. *See Attorney Grievance Comm'n of Maryland v. Vanderlinde*, 364 Md. 376, 385 (2001) ("Exceptions to the findings of our hearing judges in attorney discipline matters should be directed to facts that he [or she] finds, or facts that he [or she] expressly rejects or expressly refuses to consider."). In any event, the resolution bears little if any significance to whether Mr. Yates had knowledge of what was going to happen to his funds

39

and whether Ms. Ghatt properly safeguarded those funds. As the hearing judge properly pointed out, Mr. Yates was not a party to the resolution nor did he have any opportunity to review the resolution or the Escrow Agreement. Therefore, this exception is overruled.

Fourth and finally, Ms. Ghatt takes exception to the hearing judge's rejection of any and all evidence showing the actions Ms. Ghatt took to recover Mr. Yates's $500,000. However, we do not find anything in the findings of fact or conclusions of law that indicates the hearing judge did not consider the actions that Ms. Ghatt took in attempting to locate Mr. Yates's $500,000 that was supposed to be held in a sub-account of the Ghatt Law Group attorney trust account. There is no indication that the hearing judge expressly rejected these actions. Simply because the hearing judge did not mention those particular facts does not necessarily indicate that the hearing judge rejected or refused to consider such evidence. *See id.* at 384–85 ("We initially note that there is nothing in the findings, or the memoranda of the parties, that indicates that Judge Cawood did not consider the disease (or condition) in question. There is certainly nothing that we can find that indicates that Judge Cawood rejected the proffer, or the medical opinions of Drs. Blumberg and Tellefesen that respondent suffers from the condition. . . . *The mere failure to mention a particular fact in its findings, normally is not the equivalent of failing to consider it*.") (Emphasis added). As such, Ms. Ghatt's final exception is also overruled.

## B.     *Exceptions to the Hearing Judge's Conclusions of Law*

Ms. Ghatt takes exception to the hearing judge's conclusion that she violated the following: (1) MLRPC 1.15 Safekeeping Property; (2) MLRPC 3.3 Candor Toward the Tribunal; (3) MLRPC 8.1 Bar Admission and Disciplinary Matters; (4) MLRPC 8.4

Misconduct; (5) BOP § 10-306 Misuse of Trust Money and BOP § 10-606 Penalties. Ms. Ghatt does not take exception to the hearing judge's conclusion that she violated Md. Rule 16-607 Commingling of Funds or the conclusion that she violated Md. Rule 16-609 Prohibited Transactions.

## MLRPC 1.15 Safekeeping Property

The hearing judge concluded that Ms. Ghatt violated her fiduciary duty to Mr. Yates. Specifically, the hearing judge concluded that Ms. Ghatt placed the interests of her clients, Strategic Capital and Zion Capital, and herself above the interests of Mr. Yates and Grove Plaza, LLC by doing little to ensure that the sub-account was a genuine account prior to disbursing Mr. Yates's funds. The hearing judge noted that Ms. Ghatt did not disclose to Mr. Yates that $50,000 would be disbursed to Zion Capital and $450,000 would be immediately disbursed to Strategic Capital. The hearing judge further concluded that Ms. Ghatt owed a duty to investigate the suspicious nature of the transactions and hold the funds in safekeeping until that was resolved. Moreover, the hearing judge concluded that Ms. Ghatt failed to keep the trust funds separate from her personal funds, using her attorney trust account for personal transactions. Finally, the hearing judge concluded that Ms. Ghatt failed to promptly deliver to Mr. Yates the $500,000 that he was entitled to receive after the $5 million loan did not fund. Based on these conclusions, the hearing judge found by clear and convincing evidence that Ms. Ghatt violated MLRPC 1.15(a), (b), (d), and (e).

The pertinent sections of MRPC 1.15 provide:

(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained

41

pursuant to Title 16, Chapter 600 of the Maryland Rules, and records shall be created and maintained in accordance with the Rules in that Chapter. Other property shall be identified specifically as such and appropriately safeguarded, and records of its receipt and distribution shall be created and maintained. Complete records of the account funds and of other property shall be kept by the lawyer and shall be preserved for a period of at least five years after the date the record was created.

(b) A lawyer may deposit the lawyer's own funds in a client trust account only as permitted by Rule 16–607 b. . . .

(d) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall deliver promptly to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall render promptly a full accounting regarding such property.

(e) When a lawyer in the course of representing a client is in possession of property in which two or more persons (one of whom may be the lawyer) claim interests, the property shall be kept separate by the lawyer until the dispute is resolved. The lawyer shall distribute promptly all portions of the property as to which the interests are not in dispute.

Based on our independent review of the record, we agree with the hearing judge that Ms. Ghatt violated MLRPC 1.15(a), (b), (d), and (e).

It is clear from the record and her own testimony that Ms. Ghatt did not personally verify or confirm that a sub-account under her attorney trust account was created and held $500,000 for the benefit of Mr. Yates before she disbursed the $500,000 that Mr. Yates had wired into her attorney trust account. Moreover, Ms. Ghatt did not simply disburse Mr. Yates's funds to Strategic Capital as directed by the Escrow Agreement; instead, Ms. Ghatt also disbursed $50,000 to Zion Capital, which was not authorized by the Escrow Agreement and occurred unbeknownst to

Mr. Yates. Therefore, Ms. Ghatt did not appropriately safeguard Mr. Yates's funds as required by MLRPC 1.15(a).

We also agree with the hearing judge that Ms. Ghatt did not keep Mr. Yates's funds separate from her personal funds and deposited her own money into the same account that held Mr. Yates's $500,000 in violation of MLRPC 1.15(b). It is clear from the bank records from Citibank that Ms. Ghatt made personal purchases the same day Mr. Yates had wired the money into the Ghatt Law Group attorney trust account. In addition, Ms. Ghatt continued to use her attorney trust account, holding Mr. Yates's money, as her personal account throughout the following five months, using the account to make personal purchases and depositing funds into the account. As such, there is clear and convincing evidence that Ms. Ghatt violated MLRPC 1.15(b).

It is also clear from the record that Ms. Ghatt did not provide a full accounting of Mr. Yates's funds as required by MLRPC 1.15(d). Instead, Ms. Ghatt continuously evaded and ignored Mr. Seiler's requests for a full accounting of the $500,000 from February 2015 to May 2015. Therefore, we agree with the hearing judge that Ms. Ghatt violated MLRPC 1.15(d).

Although there is insufficient evidence that Mr. Yates disputed the distribution of his $500,000 at the time he wired the funds, Ms. Ghatt did not deliver or distribute the $500,000 that Mr. Yates was entitled to receive after the $5 million loan did not fund. As such, we agree with the hearing judge that Ms. Ghatt violated both MLRPC 1.15(d) and (e).

43

We, therefore, overrule Ms. Ghatt's exceptions to the hearing judge's conclusion that she violated MLRPC 1.15(a),(b),(d), and (e).

**MLRPC 3.3 Candor Toward the Tribunal**

The hearing judge also found that Ms. Ghatt violated MLRPC 3.3 when she knowingly made misrepresentations during the civil action Mr. Yates brought against Respondent and the Ghatt Law Group in Utah. Pursuant to MLRPC 3.3, "[a] lawyer shall not knowingly ... make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." In her initial disclosures to the Utah District Court, Ms. Ghatt stated that all parties to the escrow agreements knew that Ms. Ghatt never had control of the $500,000, that Ms. Ghatt never had control of the funds or the ability to remove the funds, and that Citibank was responsible for wiring the $500,000 to Mr. Yates rather than Ms. Ghatt or the Ghatt Law Group.

We agree with the hearing judge that these representations to the court constituted statements that Ms. Ghatt knew to be false. Ms. Ghatt had knowledge, based on the Escrow Agreement, that she was required to personally verify $500,000 in a sub-account of the attorney trust account, that Mr. Yates was to wire $500,000 into her account to wire to Strategic, and that she was specifically assigned the duty of delivering the $500,000 from the sub-account to Mr. Yates if the $5 million loan did not fund. These were directions specifically contained in the Escrow Agreement with Strategic Capital and Grove Plaza, LLC, which Ms. Ghatt signed. We find that Ms. Ghatt violated MLRPC 3.3 and overrule Ms. Ghatt's exception.

44

**MLRPC 8.1 Bar Admission and Disciplinary Matters**

MLRPC 8.1 provides, in relevant part, that "a lawyer in connection with a . . . disciplinary matter, shall not: (a) knowingly make a false statement of material fact; or (b) fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority[.]" The hearing judge found that Ms. Ghatt violated MLRPC 8.1 when she submitted the screen grab of her attorney trust account to Bar Counsel and when she failed to provide all requested bank records and information to Bar Counsel in a timely fashion.

We also find by clear and convincing evidence that Ms. Ghatt violated MLRPC 8.1. The record shows that on April 22, 2015, Ms. Ghatt submitted a written response to Bar Counsel in which Ms. Ghatt claimed that a "screen capture of my bank statement showing the funds availability is attached." Ms. Ghatt attached the same screen grab that she previously sent to Mr. Seiler with minor variations. The screenshot showed a Morgan Stanley Online (ClientServ) account holding approximately $3,800,000. Ms. Ghatt claimed that the funds were available in her attorney trust account. However, Ms. Ghatt later testified that Mr. Jalloh, her brother, had linked his account to her attorney trust account and had sent her the screenshots. We agree with the hearing judge that Ms. Ghatt violated MLRPC 8.1 when she falsely claimed to Bar Counsel that she had the available funds in her attorney trust account when she knew that the funds were actually in a separate account owned by her brother, Mr. Jalloh.

We also find clear and convincing evidence that Ms. Ghatt violated MLRPC 8.1 when she failed to timely provide Bar Counsel with the requested bank records and accounting until October 2015, nearly four months after first requested. There is also nothing in the record that shows Ms. Ghatt ever completely responded to Bar Counsel's request for information relating to other bank accounts that she mentioned during her testimony. Therefore, we overrule Ms. Ghatt's exception as to MLRPC 8.1

**BOP § 10-306 Misuse of Trust Money and BOP § 10-606 Penalties**

The hearing judge found that Ms. Ghatt violated BOP §§ 10-306 and 10-606. Under BOP § 10-306, a "lawyer may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer." Trust money is defined as "a deposit, payment, or other money that a person entrusts to a lawyer to hold for the benefit of a client or a beneficial owner." BOP § 10-301(d). When an attorney uses trust money for purposes other than for the purpose the money is entrusted to the lawyer, then the attorney "is guilty of a misdemeanor and on conviction is subject to a fine not exceeding $5,000 or imprisonment not exceeding 5 years or both." BOP § 10-606(b).

Based on our independent review of the record, we conclude that the $500,000 that Mr. Yates wired to the Ghatt Law Group attorney trust account constituted "trust money" for purposes of BOP §§ 10-306 and 10-606 because it was money that Mr. Yates entrusted to Ms. Ghatt to hold and disburse for the benefit of Grove Plaza, LLC pursuant to the terms of the Escrow Agreement. Ms. Ghatt violated BOP § 10-306 when she failed to personally confirm that a sub-account was opened with $500,000, which was required before the trust money was to be wired into her attorney trust account. She also violated BOP § 10-306

46

when she disbursed a portion of the trust money to Zion Capital, which was not authorized by the Escrow Agreement that stated Ms. Ghatt was to wire the trust money to Strategic Capital only. Therefore, Ms. Ghatt's conduct also constituted a misdemeanor pursuant to BOP § 10-606. We overrule Ms. Ghatt's exceptions to the hearing judge's conclusions as to BOP §§ 10-306 and 10-606.

## MLRPC 8.4 Misconduct

The hearing judge found that Ms. Ghatt violated MLRPC 8.4(a), (b), (c), and (d). MLRPC 8.4 provides in pertinent part:

> It is professional misconduct for a lawyer to:
> (a) violate or attempt to violate the Maryland Lawyers' Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;
> (b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;
> (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;
> (d) engage in conduct that is prejudicial to the administration of justice[.]

Based on our independent review, we conclude that Ms. Ghatt violated MLRPC 8.4(a) when she violated other provisions of the MLRPC. We also conclude that Ms. Ghatt violated MLRPC 8.4(b) when she misused trust money in violation of BOP § 10-306, which constituted a misdemeanor. *See* BOP § 10-606(b). Ms. Ghatt violated MLRPC 8.4(c) when she dishonestly stated in the Confirmation of Deposit, which she sent to Mr.

47

Yates, that she had personally verified and confirmed the existence of a sub-account holding $350,000[19] within the Ghatt Law Group attorney trust account.

In addition, Ms. Ghatt engaged in conduct involving dishonesty, fraud, deceit, and misrepresentation when she continuously evaded Mr. Seiler's questions and demands for an accounting of Mr. Yates's $500,000. Ms. Ghatt also violated MLRPC 8.4(c) when she continuously stated to Mr. Seiler that she did not give away Mr. Yates's $500,000 despite the fact that she intentionally and knowingly disbursed the funds to Strategic Capital and Zion Capital.

She also violated MLRPC 8.4(c) when Ms. Ghatt sent Mr. Seiler the screen grab of the Ghatt Law Group attorney trust account with a Morgan Stanley account which Ms. Ghatt alleged "show[ed] about 3.4M in various client holdings, and within that amount is Mr. Yates'[s] $500,000." Ms. Ghatt knew that the Morgan Stanley account was owned by her brother, Mr. Jalloh, and that she could not access the money in the Morgan Stanley account at the time Ms. Ghatt made this misrepresentation to Mr. Seiler. Ms. Ghatt violated MLRPC 8.4(c) when she implied that Mr. Yates would not receive his funds until Mr. Seiler and Mr. Yates withdrew the attorney grievance complaint and the complaint filed in the Utah District Court. Although Ms. Ghatt testified that she was simply trying to suggest to Mr. Seiler that his actions were unnecessary and nearing on harassment, we agree with the hearing judge that this testimony was not credible. Ms. Ghatt intentionally included

---

[19] Again, Ms. Ghatt testified that the Confirmation of Deposit was supposed to read $500,000 rather than $350,000.

the demands to withdraw both complaints in the same email that she stated she was approved to deliver the funds back to Mr. Yates.

Ms. Ghatt once again violated MLRPC 8.4(c) when she made knowingly false statements in her initial disclosures to the Utah District Court, when she made knowingly false statements to Bar Counsel during their investigation, and when she sent Bar Counsel a similar screenshot as the one she sent to Mr. Seiler, implying that she had access and control of Mr. Yates's $500,000.

We also conclude that Ms. Ghatt violated MLRPC 8.4(d) by engaging in conduct prejudicial to the administration of justice. A lawyer violates MLRPC 8.4(d) when he or she acts in such a way that negatively impacts the public's perception of the legal profession. *See Attorney Grievance Comm'n of Maryland v. Marcalus*, 442 Md. 197, 205 (2015). This Court does not have sufficient evidence to find that Ms. Ghatt created or originally knew that the Ghatt Law Group attorney trust account was being misused as part of an advanced fee scheme. However, Ms. Ghatt acted in a way that negatively impacts the perception of the legal profession when she continuously evaded questions about Mr. Yates's $500,0000, which was subsequently lost to an advanced fee scheme, misrepresented how she handled the $500,000, and falsely implied that she had control of the $500,000 when she sent the screenshots to Mr. Seiler and Bar Counsel. This Court finds clear and convincing evidence that Ms. Ghatt should have investigated the suspicious nature of the advanced fee scheme rather than continuously acting in a way that covered up the scam.

Therefore, we overrule Ms. Ghatt's exception as to MLRPC 8.4.

49

## Md. Rule 16-607 Commingling of Funds and Md. Rule 16-609 Prohibited Transactions

Ms. Ghatt did not except to the hearing judge's conclusion that she violated former Md. Rules 16-607 and 16-609. Former Md. Rule 16-607 generally prohibited an attorney from depositing personal funds into an attorney trust account unless explicitly required or permitted by the Maryland Rules. Ms. Ghatt violated Md. Rule 16-607 when she deposited, or permitted others to deposit on her behalf, $5,000 that she earned for serving as escrow agent for Strategic Capital and Zion Capital, which effectively commingled her funds with the attorney trust account.

We also conclude that Ms. Ghatt violated former Md. Rule 16-609, which prohibited an attorney from using funds for any unauthorized purpose, prohibited an attorney from making cash disbursements from an attorney trust account, and prohibited a disbursement from an attorney trust account that would create a negative balance. The record shows clear and convincing evidence that Ms. Ghatt disbursed $50,000 of Mr. Yates's funds to Zion Capital, which was not authorized by the Escrow Agreement or Mr. Yates, resulting in a violation of both BOP § 10-306 and former Md. Rule 16-609(a). We also find clear and convincing evidence that Ms. Ghatt made ATM withdrawals as well as debit card purchases from the Ghatt Law Group attorney trust account in violation of former Md. Rule 16-609(b). Finally, we find clear and convincing evidence for the hearing judge's conclusion that Ms. Ghatt violated former Md. Rule 16-609(c) when she incurred a negative balance on the Ghatt Law Group attorney trust account in January 2015 when she wired $125,000 out of the attorney trust account twice.

Based on our independent review of the record, we find clear and convincing evidence that Ms. Ghatt violated both former Md. Rule 16-607 and 16-609.

## SANCTION

We now consider the appropriate sanction for Ms. Ghatt's misconduct. The Commission, through Bar Counsel, recommends that the appropriate sanction for Ms. Ghatt is disbarment. Respondent, instead, argues that she should only be reprimanded because she was not part of the advanced fee scheme and did not commit intentional dishonest misconduct.

In fashioning the appropriate sanction, this Court will take into account the facts and circumstances of the case, the gravity of the misconduct, and any aggravating or mitigating factors. Overall, the purpose of a sanction is not to punish the lawyer, but rather to protect the public and maintain confidence in the legal profession. *See Attorney Grievance Comm'n of Maryland v. Jacobs*, 459 Md. 291, 311 (2018).

This Court has repeatedly stated:

 [I]n cases of intentional dishonesty, misappropriation cases, fraud, stealing, serious criminal conduct and the like, we will not accept, as "compelling extenuating circumstances," anything less than the most serious and utterly debilitating mental or physical health conditions, arising from any source that is the "root cause" of the misconduct *and* that also result in an attorney's utter inability to conform his or her conduct in accordance with the law and with the MRPC. Only if the circumstances are that compelling, will we even consider imposing less than the most severe sanction of disbarment in cases of stealing, dishonesty, fraudulent conduct, the intentional misappropriation of funds or other serious criminal conduct, whether occurring in the practice of law, or otherwise.

51

*Vanderlinde*, 364 Md. at 413–14. This Court further explained that disbarment is ordinarily the appropriate sanction because "unlike matters relating to competency, diligence and the like, intentional dishonest conduct is closely entwined with the most important matters of basic character to such a degree as to make intentional dishonest conduct by a lawyer almost beyond excuse." *Id.* at 418.

We have similarly held that "the misappropriation of entrusted funds 'is an act infected with deceit and dishonesty, and, in the absence of compelling extenuating circumstances justifying a lesser sanction, will result in disbarment.'" *Attorney Grievance Comm'n of Maryland v. Cherry-Mahoi*, 388 Md. 124, 161 (2005) (quoting *Attorney Grievance Comm'n of Maryland v. James*, 385 Md. 637, 666 (2005)). "Fiduciaries in general, and attorneys in particular, must remember that the entrustment to them of the money and property of others involves a responsibility of the highest order. They must carefully administer and account for those funds. Appropriating any part of those funds to their own use and benefit without clear authority to do so cannot be tolerated." *Attorney Grievance Comm'n of Maryland v. Owrutsky*, 322 Md. 334, 345 (1991).

In this case, we have concluded that Ms. Ghatt engaged in intentional dishonest conduct *and* that she misused trust money. Ms. Ghatt specifically represented to Mr. Yates, by way of the Confirmation of Deposit, that she had personally verified and confirmed the existence of a sub-account holding $500,000 in the Ghatt Law Group attorney trust account. However, Ms. Ghatt's testimony revealed that she merely relied on the same Confirmation of Deposit that Strategic Capital had sent her rather than verifying the sub-account by investigating with Citibank and her attorney trust account. In addition, Ms.

52

Ghatt sent a screenshot of her Citibank attorney trust account to both Mr. Seiler, acting as Mr. Yates's attorney, and Bar Counsel, suggesting that she was holding the $500,000 owed to Mr. Yates despite full knowledge that her brother had linked his own account to Citibank and that he had sent her the screenshots. These are the two most troubling instances of dishonest conduct, which constituted violations of MLRPC 3.3, 8.1, and 8.4.

In addition, Ms. Ghatt improperly used the trust money that Mr. Yates wired into her attorney trust account by wiring $50,000 directly to Zion Capital, which was not authorized by the Escrow Agreement or Mr. Yates. Ms. Ghatt also used the attorney trust account, holding Mr. Yates's money, as a personal bank account by making personal purchases, depositing personal funds, and making ATM withdrawals. These actions constituted violations of MLRPC 1.15, BOP §§ 10-306 and 10-606, and former Md. Rules 16-607 and 16-609.

Both of these violations are the type this Court has repeatedly ordered disbarment absent compelling extenuating circumstances. As such, we are inclined to order disbarment, but will first consider any mitigating or aggravating factors to assess whether they amount to "compelling extenuating circumstances." *Vanderlinde*, 364 Md. at 413.

Although the hearing judge found that Ms. Ghatt did not establish any mitigating factors by a preponderance of the evidence, Ms. Ghatt urges this Court to consider the following mitigating circumstances: absence of a dishonest or selfish motive; timely good faith efforts to make restitution; full and free disclosure and cooperative attitude toward Bar Counsel; inexperience in the practice of law; imposition of other penalties; remorse; and absence of a prior disciplinary record.

Contrary to Ms. Ghatt's assertions, the record makes clear that Ms. Ghatt did not lack a dishonest or selfish motive during the events leading to the attorney grievance complaint. Instead, Ms. Ghatt acted dishonestly and with a selfish motive when she continuously misled Mr. Seiler, Mr. Yates, and Bar Counsel about what happened to Mr. Yates's $500,000. Ms. Ghatt also acted with a selfish and dishonest motive when she sent the misleading screen grab purporting to be her attorney trust account with $3.4 million to Mr. Seiler and, in exchange, demanded that he withdraw the attorney grievance complaint and civil lawsuit in Utah.

Ms. Ghatt also did not make timely good faith efforts to make restitution or make full and free disclosure with a cooperative attitude to Bar Counsel. Instead, Ms. Ghatt still has not wired Mr. Yates $500,000 from a sub-account of her attorney trust account that she stated she had personally verified; Ms. Ghatt has also not paid Mr. Yates the $500,000 judgment awarded against her and in favor of Mr. Yates in the Utah civil action. Rather than cooperate with Bar Counsel, Ms. Ghatt either did not timely submit bank records or failed entirely to submit requested records. Moreover, Ms. Ghatt made misrepresentations to Bar Counsel during their investigation when she sent the screen grab to the Commission without specifying that the Morgan Stanley account was owned by her brother, who also forwarded her the screenshots.

Inexperience in the practice of law and the imposition of losses for representing herself in this matter also do not constitute mitigating circumstances. Although Ms. Ghatt may not have had experience with banking transactions or escrow agreements, Ms. Ghatt had a duty to investigate and understand the two escrow agreements involved in this matter

54

rather than simply passing along information and money as requested by her clients, Strategic Capital and Zion Capital. The fact that Ms. Ghatt represented herself and was exposed to damaging claims in this matter does not suffice as a mitigating circumstance when she had previously engaged in intentionally dishonest conduct and misappropriation of trust money.

Ms. Ghatt finally contends that her remorse should be a mitigating factor. However, this Court finds that whatever remorse Ms. Ghatt has shown for Ms. Yates's lost $500,000 is greatly offset by the fact that Ms. Ghatt continuously misrepresented and misled Mr. Yates, Mr. Seiler, and Bar Counsel about what happened to the funds, what documents she was relying on in disbursing the funds, and whether she had control of the funds. Therefore, any remorse that Ms. Ghatt displayed after such intentionally dishonest conduct is not a compelling extenuating circumstance.

This Court finds that the only mitigating factor established by Ms. Ghatt is that she has no prior disciplinary record. However, this Court has previously found that the lack of prior disciplinary actions and a good reputation does not constitute compelling extenuating circumstances that would warrant a sanction other than disbarment. *See Attorney Grievance Comm'n of Maryland v. Palmer*, 417 Md. 185, 214 (2010). In this case we also conclude that the lack of a prior disciplinary record is insufficient to rise to the level of "compelling extenuating circumstances."

Based on our review of the record, we agree with the hearing judge that there is clear and convincing evidence of the following aggravating factors: Ms. Ghatt acted with a dishonest or selfish motive when she failed to disclose the escrow agreements and

55

pertinent information to Mr. Seiler or Bar Counsel; she displayed a pattern of misconduct in misrepresenting the disbursements of the $500,000; she refused to acknowledge that she played a role in the advanced fee scheme by unquestioningly providing use of her attorney trust account to Strategic Capital and Zion Capital; Ms. Ghatt had substantial experience in the practice of law; and, to date Ms. Ghatt has not paid Mr. Yates any portion of the $500,000 either as required by the Confirmation of Deposit or the judgment against her in the Utah action.

In this case, we concluded that Ms. Ghatt was involved in intentionally dishonest conduct and misusing trust money, both of which ordinarily result in disbarment absent "compelling extenuating circumstances." Having been presented with multiple aggravating factors and no sufficient "compelling extenuating circumstances," we hold that the appropriate sanction in this case is disbarment.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 19-709(d). JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST JENEBA JALLOH GHATT IN THE SUM OF THESE COSTS.**

56